# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4068

_____

Jimmy Don Wooten,                        *
                                         *
          Petitioner - Appellant,        *
                                         *     Appeal from the United States
     v.                                  *     District Court for the Eastern
                                         *     District of Arkansas.
Larry Norris, Director, Arkansas         *
Department of Correction,                *
                                         *
          Respondent - Appellee.         *

_____

Submitted: September 25, 2008
Filed:  August 26, 2009

_____

Before RILEY, BRIGHT, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Arkansas death-row inmate Jimmy Don Wooten appeals the district court's[1] denial of his 28 U.S.C. § 2254 petition for habeas relief. The district court and our court granted certificates of appealability regarding two ineffective assistance of counsel claims. Wooten alleges that his trial counsel was constitutionally ineffective during the guilt phase of his bifurcated trial for failing to argue that mental-health issues prevented Wooten from formulating the necessary mens rea for his capital

_____

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

offense. Wooten also alleges that trial counsel was constitutionally ineffective for failing to present mitigating evidence during the penalty-phase trial. Wooten argues that mitigation evidence regarding mental-health issues and a tragic personal history would have helped to disprove the applicability of a death-qualifying aggravator. He also argues this evidence would have swayed the jury as to the balancing of mitigating and aggravating circumstances in its ultimate decision to recommend the death penalty rather than life imprisonment. We affirm.

I.     Background

The Arkansas Supreme Court set forth the details of Wooten's underlying offense as follows:

> On August 5, 1994, David LaSalle, Henry Teb Porter, and Molly Porter were hiking on a forest trail near the Long Pool recreation area in Pope County when they encountered appellant Jimmy Don Wooten. Wooten was riding a six-wheel all-terrain vehicle. At trial, Henry Porter testified that the group had three encounters with Wooten before he attacked them and shot David LaSalle. LaSalle died as a result of a single gunshot wound to the head. Porter also testified that Wooten shot him in the shoulder, forearm, and face, and that he was able to remove the key from Wooten's all-terrain vehicle before Wooten chased him into the woods. Molly Porter, Henry Porter's daughter, testified that Wooten shot LaSalle and shot her father and chased after him.
>
> On the day of the shooting, Wooten reported that an assailant who looked just like him had stolen his six-wheel vehicle while he was fishing near Long Pool and had shot at him using the .22 caliber pistol he had in the vehicle. Wooten claimed that he later found the vehicle with the gun abandoned by the side of the road near his truck. A .22 caliber bullet was recovered from David LaSalle's body. It was determined that Wooten's gun fired a spent .22 caliber cartridge found at the location where LaSalle and Porter were shot. In addition,

-2-

swimming trunks found at Wooten's home matched Henry and Molly Porter's description of trunks worn by the assailant.

Wooten v. State, 931 S.W.2d 408, 409 (Ark. 1996) ("Wooten I"). Trial testimony from the surviving victims showed that, in the three encounters between the victims and Wooten prior to the shooting, Wooten's behavior was bizarre and erratic. He first passed the group at a high rate of speed without acknowledging them. He next stopped and talked to the group in a cordial fashion and gave them directions to Long Pool recreation area. He then departed, but a few minutes later he passed the group again on his ATV going "as fast as you could on that trail." Shortly thereafter, he shot at the hikers from a hidden position in the woods. Molly Porter was able to run away and hide in a rock formation, and David LaSalle died of his wounds. Henry Porter successfully chased Wooten from the scene despite the fact that Wooten shot him in the face and shoulder.

At the guilt-phase trial, Wooten's attorney, David Gibbons, pursued a theory of mistaken identity. The jury rejected this theory and found Wooten guilty of capital murder, criminal attempt to commit capital murder, and aggravated assault. Ample evidence, including eyewitness accounts from the victims and corroborating physical evidence, supported the state's case against Wooten.

Gibbons's entire penalty-phase presentation filled fewer than ten full pages of trial transcript, including his opening and closing arguments. He presented only two witnesses, an officer from the jail where Wooten was housed prior to and during the trial and one of Wooten's former co-workers. The officer testified that Wooten had no criminal record, was a "good prisoner," and could work in prison if sentenced to life imprisonment. The co-worker testified that Wooten was a good worker. In closing, Gibbons told the jury that they would "have to" find the aggravating circumstance asserted by the state, namely, that "the person in the commission of the capital murder knowingly created a great risk of death to a person other than the

victim." Gibbons told the jury he did not intend to appeal to emotion, and, in fact, he presented no evidence of personal history or testimony from family members to humanize Wooten.

The jury found the "knowingly created a great risk of death" aggravator. The jury also found several mitigating circumstances: Wooten had no prior criminal record, he had an "exemplary work ethic," he had "more than one job skill" that he could use in prison, he had adapted to prison and was a good prisoner, and he "did not take the life of . . . Molly Porter." The jury then weighed the aggravator against the mitigating circumstances and recommended the death penalty.

On direct appeal, Gibbons continued his representation of Wooten and presented three arguments to the Arkansas Supreme Court. First, he argued that Wooten's trial was tainted by a violation of Batson v. Kentucky, 476 U.S. 79 (1986), because the state exercised a peremptory strike to exclude the sole African-American member of the jury panel. Wooten I, 931 S.W.2d at 409–10. Second, he argued that the district court erred by permitting the state to present victim-impact testimony in its initial presentation during the penalty-phase trial. Id. at 411. Gibbons asserted that such testimony could only be used as rebuttal against Wooten's mitigation evidence. Finally, Gibbons argued that the trial court erred in denying a motion to exclude identification evidence from what he characterized as an unduly suggestive lineup. Id. at 412. In an opinion issued in September 1996, the Arkansas Supreme Court rejected these arguments. Id. at 413. A separate attorney then represented Wooten for the limited purpose of filing an unsuccessful petition for certiorari with the U.S. Supreme Court. Wooten v. Arkansas, 519 U.S. 1125 (1997).

After the denial of certiorari, Wooten's wife hired attorney James O. Clawson to represent Wooten for the purpose of state post-conviction proceedings. This proved to be an unfortunate selection. As of 1990, Clawson was a licensed attorney in Oklahoma and Arkansas. In 1993, he was disbarred in Oklahoma, and in 1994, he

was convicted in Oklahoma and sentenced to two years' imprisonment on two felony counts of uttering forged instruments. Upon release from prison, he moved to Arkansas. The parties dispute the extent to which his disbarment and felony convictions in Oklahoma should have automatically disqualified him from practicing law in Arkansas. It is beyond dispute, however, that Clawson had a duty to disclose these facts to the Arkansas courts and that this information would have been material not only to the court but also to persons hiring Clawson to assist in a death-penalty matter.

Clawson did not disclose his convictions or disbarment, and he continued to practice law in Arkansas for several years, during which time he represented Wooten. As such, we find it easy to adopt Wooten's characterization of Clawson's concealment as a fraud upon Wooten and upon the courts of Arkansas. As explained below, Clawson ran afoul of the law and breached the Rules of Professional Conduct on several occasions after he moved to Arkansas. His status as a felon, however, did not come to light in Arkansas until well into Wooten's post-conviction proceedings.

On April 21, 1997, Clawson filed an initial petition for post-conviction relief in the state trial court on Wooten's behalf. The petition was ten pages long, and in the second paragraph Clawson asserted that, despite the exercise of due diligence, it was not possible to complete an adequate investigation. As such, he requested "leave to amend to provide additional facts and/or claims as they are discovered."

As relevant to the issues currently before our court, Clawson alleged in subparagraph (4)(C) of the initial petition that trial counsel was ineffective for "failing to employ the services of any expert witnesses, or request funds to do so as allowed under Arkansas law." The petition did not specifically identify the missing expert witnesses as psychiatrists or psychologists; rather, the petition discussed ballistics experts. The petition did reference the U.S. Supreme Court case, Ake v. Oklahoma, 470 U.S. 68 (1985), which dealt with the availability of state funds for a psychiatrist,

-5-

but the petition cited this case in reference to funding for a ballistics expert. In fact, nothing in the petition for state post-conviction relief suggests that mental-health issues were the focus of Clawson's argument regarding ineffective assistance of trial counsel.

In subparagraph (4)(F) of the petition, Clawson alleged:

> Counsel did not, in voir dire, opening statement or closing arguments, attempt to educate the jury on the issues involved in a capitol [sic] sentencing; he did not focus the jury's attention to the role of mitigation, the humanity of his client, the presumption in law of life as the appropriate sentence, the need for each juror to be satisfied beyond a reasonable doubt of the appropriateness of the death penalty-in short, he made no plea for Wooten's life. In fact, during the penalty phase, counsel said in closing, " I will not use emotion."

> . . . .

> Counsel was ineffective for failing to offer for the jury's consideration the following mitigating circumstances: counsel did not call [Wooten's] wife or friends to establish Wooten's ability to maintain friendship and favorable qualities, his character and humanity. Counsel made no argument for mitigation, no plea for mercy, and in short, did absolutely nothing a reasonably competent attorney would have done to provide effective representation in the penalty phase.

In addition, Clawson alleged that trial counsel misunderstood the law regarding the admissibility of victim-impact testimony in the penalty phase because trial counsel incorrectly believed such testimony to be admissible only if the defendant first opened the door for rebuttal by presenting mitigation evidence. Clawson alleged that this misunderstanding, as reflected in counsel's arguments during the trial and on direct appeal, was one of the reasons counsel failed to introduce additional mitigating evidence.

In a separate document filed simultaneously with the initial petition and entitled "Motion to File Expanded Petition," Clawson sought permission to file a second, longer petition that would exceed the ten-page limit contained in Arkansas Rule of Criminal Procedure 37.1. He filed the second petition entitled "First Amended Petition for Relief Under Ark. Rules Crim. Pro., Rule 37" simultaneously with the other two documents. He asserted that the second petition was required in order to treat "the numerous and complex issues involved in this matter at an appropriate length." The second petition, however, was only eleven pages long and essentially indistinguishable from the initial, ten-page petition.

Also, although Arkansas Rule of Criminal Procedure 37.1 at that time required defendants to personally verify their Rule 37 filings, Clawson neither informed Wooten of the filings nor sought his verification of the petitions. Clawson did not attempt to present any evidence in support of the Rule 37 filings. Accordingly, the state trial court's record following trial and including the Rule 37 filings contained no evidence regarding the factual issues Wooten now relies upon in support of his federal habeas petition, namely, mental illness, organic brain injury, decreased cognitive functioning, tragic life history, and post-traumatic stress disorder.

In September 1997, in a summary one-page order containing no written findings, the state trial court denied Wooten's Rule 37 petitions on the grounds that they contained no allegations of prejudice and insufficient factual allegations to enable the trial court to determine whether an evidentiary hearing was necessary. In April 1998, Clawson filed an untimely appeal from the district court's denial of Rule 37 relief. The Arkansas Supreme Court excused the tardiness of the appeal by invoking authority that permits untimely appeals when the untimeliness clearly is due to counsel's own failings and where a refusal to excuse the tardiness would prejudice a defendant. This procedure resulted in the Arkansas Supreme Court notifying its Committee on Professional Conduct of Clawson's failure. The appeal brief that Clawson ultimately filed contained only five pages of argument.

In June 1998, while Wooten's appeal was pending, Clawson was convicted in Arkansas on charges of drunk driving and careless driving. In August 1998, the Arkansas Supreme Court reprimanded Clawson in relation to a bankruptcy case, finding that he engaged in "conduct involving dishonesty, fraud, deceit, or misrepresentation," "knowingly failed to disclose a material fact" to the court, "knowingly offered evidence [he knew] to be false," failed to appear at scheduled hearings, and "subjected his client to potential criminal liability." In December 1998, the Arkansas Supreme Court reprimanded Clawson for "false or misleading" advertising in relation to a telephone book advertisement. In September 1999, the Arkansas Supreme Court held Clawson in contempt for his failure to file a direct appeal for a client in an unrelated criminal case, even after the client repeatedly asked him to file an appeal. See Kirby v. State, 999 S.W.2d 180 (Ark. 1999). Again, the Arkansas Supreme Court referred him to the court's Professional Conduct Committee.

In October 1999, the Arkansas Supreme Court ruled on Wooten's appeal from the trial court's summary denial of his Rule 37 petition. Wooten v. State, 1 S.W.3d 8 (1999) ("Wooten II"). Identifying, sua sponte, that the trial court's ruling denying state post-conviction relief was infirm as a matter of state law due to the absence of written findings, the Arkansas Supreme Court remanded to the trial court with directions to hold a hearing or enter written findings. Id. at 11. Clawson had not argued this basis for relief in the appeal brief, and he took no action on Wooten's behalf following the remand. In addition, he failed to apprise Wooten of the remand or otherwise inform him regarding the status of the case.

In March 2000, the Arkansas Supreme Court reprimanded Clawson in relation to Kirby. In the same month, Clawson was again convicted of drunk driving in Arkansas.

In June 2000, the state trial court entered written findings in support of its earlier denial of Rule 37 relief in Wooten's case, in compliance with the Arkansas

Supreme Court's remand order in Wooten II.  Because Clawson had taken no action on Wooten's behalf following the Arkansas Supreme Court's sua sponte remand, the trial court held no evidentiary hearing.  Clawson subsequently failed to file an appeal.

In April 2001, Clawson was convicted in federal court on six counts of bankruptcy fraud and sentenced to eighteen months' imprisonment.  The sentencing judge was "shocked" that Clawson had been practicing law in light of his prior Oklahoma convictions and disbarment and noted that Clawson had concealed his prior record from the Arkansas courts.  The federal prosecutor in Clawson's case notified the Arkansas Supreme Court of Clawson's past, and the Arkansas Supreme Court struck Clawson from its list of licensed attorneys.

In September 2001, Wooten learned of Clawson's federal conviction, criminal and disciplinary history, and disbarment. Wooten also discovered that no one had filed an appeal on his behalf following the post-remand order denying Rule 37 relief. Wooten then filed a pro se motion for appointment of counsel and sought permission to file a belated appeal of the state trial court's post-remand ruling.  In October 2001, the Arkansas Supreme Court granted Wooten permission to appeal and appointed attorney Alvin Schay to represent Wooten.

Schay briefed some but not all of the issues Clawson had raised in the Rule 37 petitions.  Schay argued trial counsel was constitutionally ineffective: "1) for failure to put on mitigation evidence in the penalty phase; 2) for failure to argue that the Arkansas death penalty scheme is unconstitutional; and 3) for failure to preserve certain issues at trial." Wooten v. State, 91 S.W.3d 63, 65 (Ark. 2002) ("Wooten III"). Ultimately, the Arkansas Supreme Court affirmed the state trial court's denial of post-conviction relief.  Id.  As relevant here, the court rejected the penalty-phase mitigation-evidence argument finding that Wooten neither presented mitigation evidence to the state court nor identified what that mitigation evidence might have been or how it would have impacted the trial:

-9-

Wooten argues other evidence in mitigation should have been offered. However, Wooten provided nothing to the trial court in his Rule 37 petition proceedings regarding what mitigation evidence his counsel should have presented. He states in his brief that the Rule 37 court noted that "petitioner did not state what additional witnesses for Mr. Wooten would have said." Wooten fails to establish what other witnesses would have testified to, and he fails to show how their testimony could have changed the outcome of his case. When a petitioner fails to show what the omitted testimony was and how it could have changed the outcome, we will not grant postconviction relief for ineffective assistance of counsel. Wooten thus fails to show that he is entitled to relief on this point.

Id. at 66 (internal citations omitted).

In October 2003, Schay and an Assistant Federal Public Defender from Arkansas filed a federal habeas petition and a first amended petition on Wooten's behalf pursuant to 28 U.S.C. § 2254. They supported the federal habeas petition with a proffer of evidence including a description of a tragic life history involving brutal abuse by Wooten's father. They also provided an affidavit in the form of a preliminary opinion from a board-certified psychiatrist who had administered a cognitive-function test to Wooten on September 8, 2003. That psychiatrist concluded, "[Wooten] appears to have a specific cognitive impairment that consists of an inability to understand immediate situations, requiring time and structure in order to process effectively." The petition alleged this evidence would have been beneficial to Wooten at the penalty phase in that it would have been valuable mitigation evidence the jury should have been asked to consider when balancing the aggravating and mitigating circumstances.

In June 2006, Schay and the Assistant Federal Public Defender filed a motion to be removed as counsel and to have three Assistant Federal Defenders from the Federal Community Defender's Office for the Eastern District of Pennsylvania

-10-

appointed as replacement counsel ("Pennsylvania Counsel").[2] On September 19, 2006, the district court entered orders granting the motion and simultaneously denying the petitions for habeas relief. As relevant to the present appeal, the district court commented upon the evidence presented in support of the habeas petition. Regarding evidence of a tragic life history, the court stated:

> [G]iven the evidence against Wooten, including Porter's and Molly's compelling testimony at trial positively identifying Wooten as the assailant, it cannot be said that there is a reasonable likelihood the jury would have acquitted Wooten of capital murder or sentenced him to life even if trial counsel had admitted additional evidence of life history.

Regarding evidence of mental impairments, the court stated:

> Wooten claims trial counsel failed to adequately investigate his mental health for issues relating to guilt and sentencing. He argues that had trial counsel conducted an adequate social history investigation and sought funding for a mental health expert or taken steps to secure the assistance of a mental health expert . . . he would have found that Wooten's actions . . . were the product of a mental disease or defect and that Wooten lacked the capacity to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct at the time of his offense.
>
> . . . .
>
> . . . Wooten failed to make [the requisite] preliminary showing, however, perhaps because there is nothing in the record demonstrating that his sanity at the time of the offense was likely to be a significant factor at trial.

---

[2]Pennsylvania Counsel are experienced in death penalty cases, see Rompilla v. Beard, 545 U.S. 374 (2005) (granting habeas relief regarding a death sentence in a case handled by Pennsylvania Counsel), and, apparently, make their services available to petitioners outside the Eastern District of Pennsylvania.

In a footnote, the court elaborated:

> Among other things, Wooten was able to hold several jobs, including maintenance work and small vehicle repairs, graduate high school (albeit near the bottom of his class), attend college for two years, maintain his driver's license, and, apparently, operate an aircraft, having formerly owned a "Beachcraft Skipper" airplane.

Shortly thereafter, still in September 2006, Pennsylvania Counsel moved for reconsideration under Federal Rule of Civil Procedure 59(e) and moved to have the district court stay the federal case and hold federal proceedings in abeyance pending further exhaustion of state remedies. In late September, another psychiatrist examined Wooten, and on October 10, 2006, Pennsylvania Counsel tendered a written opinion from the second psychiatrist who opined "to a reasonable degree of medical certainty, that currently, at the time of the offense, trial and sentencing, and throughout his adult life, Mr. Wooten was suffering from Post-Traumatic Stress Disorder with Dissociative Features." The psychiatrist described how a tragic childhood of brutal abuse caused this disorder and explained the condition as "a dissociative mental state involving irrational thinking and perceptions, and a break with reality." In late November 2006, Pennsylvania Counsel tendered a report from a board-certified neuropsychologist and forensic examiner and updated reports from the first two experts who added to their opinions after reviewing one anothers' reports. The third expert opined that Wooten suffered from Post-Traumatic Stress Disorder with Dissociative Features and, in fact, suffered organic brain damage.

On December 1, 2006, after receiving and reviewing the reports from the experts described above, the district court entered an order stating that it had considered the reports and its previous rulings and that the reports did "not have any bearing on these habeas proceedings" or the earlier denial of relief and denial of the Rule 59(e) motion to reopen. The district court briefly recited the conclusions of the experts and stated, "Among other things, Wooten, as found by the jury, has no

significant history of prior criminal activity."  The court again noted Wooten's achievements in life that seemed contrary to the experts' prognoses and concluded:

> In this respect Wooten has not shown a reasonable probability that the result of the proceedings would have been different had such mental health evidence as described in the affidavits been admitted and, thus, he has not shown ineffective assistnace of counsel due to trial counsel's alleged failure to adequately investigate his mental health for issues relating to guilt and sentencing.

The district court granted a certificate of appealability regarding Wooten's claim that trial counsel was ineffective at the penalty phase for "failing to investigate, prepare and present mitigating evidence concerning his life history."  Pennsylvania Counsel appealed to our  court, and we expanded the certificate to include the issue of "whether trial counsel was ineffective at the guilt phase when counsel did not investigate or present evidence of a possible mental defect, i.e., post-traumatic stress disorder."

In March 2007, Pennsylvania Counsel along with new local counsel, Arkansas attorney J. Blake Hendrix, filed in the Arkansas Supreme Court a Motion to Recall Mandate and Reopen Post-Conviction Proceedings ("Motion to Recall and Reopen"). Later that month, all four attorneys filed in the Arkansas Supreme Court a Motion to Appear as Counsel ("Motion to Appear").  Pennsylvania Counsel made a substantial proffer of evidence with the Motion to Recall and Reopen, including several experts' reports detailing Wooten's life history and attendant mental-health problems.  This was the first and only presentation of evidence in state court regarding the issues of Wooten's mental infirmities and tragic life history.  The March 2007 filings also served as the first specific articulation of these issues because the earlier Rule 37 petitions (filed by Clawson and defended on appeal by Schay) contained only vague statements alleging ineffectiveness based on the absence of unidentified mitigation evidence.  The State resisted the Motion to Appear but did not resist the Motion to

Recall and Reopen. In April 2007, the Arkansas Supreme Court denied the Motion to Appear but did not address the Motion to Recall and Reopen.

Presently before our court is Wooten's appeal from the district court's September 2006 denial of his habeas petition and November and December 2006 denials of his Rule 59(e) motion and motion for stay and abeyance. At oral argument, the parties contested the current status of the state-court Motion to Recall and Reopen. The State argued that the Arkansas Supreme Court's denial of the Motion to Appear necessarily and implicitly disposed of the Motion to Recall and Reopen. Wooten argued that the status of the Motion to Recall and Reopen was unknown but that, arguably, it remained pending. After oral arguments, the parties filed supplemental briefs addressing authority regarding the Arkansas procedure surrounding motions to recall and reopen and the appointment of federal habeas counsel to assist in further state-court proceedings. The supplemental briefs did not clarify the status of Wooten's Motion to Recall and Reopen in the state court.

II. Discussion

Federal courts may not grant habeas relief based on procedurally defaulted claims if the state court's reason for finding default rests on adequate and independent state grounds. Niederstadt v. Nixon, 505 F.3d 832, 835 (8th Cir. 2007) (en banc), cert. denied, 128 S. Ct. 1875 (2008). A claim is procedurally defaulted if a habeas petitioner failed to raise it in state proceedings. See, e.g., Francis v. Miller, 557 F.3d 894, 897 n.3 (8th Cir. 2009) (characterizing a failure to raise an argument in state court as a procedural default), petition for cert. filed, No. 09-5388 (July 9, 2009). Also, if a petitioner has not developed a factual record in state court to support a federal habeas claim, a federal evidentiary hearing to develop those facts generally is unavailable. See 28 U.S.C. § 2254(e)(2).

A showing of cause and prejudice may serve to excuse a procedural default and open the door to federal review of an applicant's otherwise defaulted claim. Greer v. Minnesota, 493 F.3d 952, 957 (8th Cir. 2007). Similarly, if some impediment external to the applicant is responsible for the omissions in the state-court factual record or if the applicant can show cause and prejudice regarding the omissions, federal courts may grant an evidentiary hearing on the merits. See Williams v. Taylor, 529 U.S. 420, 431–32 (2000) (determining that the statutory phrase "failed to develop the factual basis of a claim in State court" as found in 28 U.S.C. § 2254(e)(2) requires a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"); see also 28 U.S.C. § 2254(e)(2)(A)(ii), (B) (describing cause and prejudice, respectively, in the context of newly presented evidence). In addition, federal review may be available where a refusal to consider an otherwise defaulted claim or undeveloped record is necessary to prevent a miscarriage of justice, i.e., where the defaulted claim or omitted evidence establishes "actual innocence" as to the underlying offense or ineligibility for the death penalty. See Schlup v. Delo, 513 U.S. 298, 326–30 (1995) (discussing standards for proof of actual innocence as a means to overcome procedural default); Sawyer v. Whitley, 505 U.S. 333, 347 (1992) (holding that actual innocence in the death-penalty context refers to eligibility for the death penalty and not to the jury's ultimate balancing of aggravating and mitigating circumstances).

Setting aside for the moment the impact, if any, regarding the later-filed, state-court Motion to Recall and Reopen and Motion to Appear, Wooten's current claims are procedurally defaulted. In state court, Wooten did not present his guilt-phase ineffective-assistance claim. Accordingly, he afforded the state courts no opportunity to address his argument that a tragic childhood of abuse induced mental infirmities and organic brain damage that prevented him from being able to develop the necessary mens rea for his capital offense. Also, Wooten did not argue to the state courts that trial counsel was ineffective at the penalty-phase trial for failing to assert mental infirmities in an attempt to rebut the state's arguments regarding the death-qualifying

aggravator. Wooten did argue, generally, that trial counsel was ineffective during the penalty phase for failing to present additional mitigation evidence. As quoted above, however, the Arkansas Supreme Court determined that he did not identify what that mitigation evidence might have been or how it would have impacted the trial. Wooten III, 91 S.W.3d at 66.

In an attempt to overcome the bars to our review, Wooten argues that he did not "fail" to present or develop the factual basis of his claims in state court because he and the Arkansas courts were victims of Clawson's fraud. In making this argument, he characterizes Clawson's fraud as an external impediment that should excuse infirmities in the state court record. He also argues that we should permit the development of his claims in federal court because Clawson's fraudulent actions show that Clawson was not acting as Wooten's agent. As such, Wooten argues, we should not attribute Clawson's failures to Wooten, but rather, treat them as cause to excuse default. He also argues that evidence trial counsel failed to present would have demonstrated his actual innocence regarding the underlying crime and the death penalty.

Wooten argues in the alternative that the Motion to Recall and Reopen is a permissible avenue for presenting claims and evidence to the state courts. As such, he argues that we should view the state record not as it stood following the Arkansas Supreme Court's ruling in Wooten III but as supplemented with his Motion to Recall and Reopen and accompanying evidentiary proffer. Viewed in this light, the record would contain the present arguments and evidence to support the present arguments.

A. "Failed to Develop" and Cause for Omissions

The substance of the argument that Wooten did not "fail" to develop the factual bases for his claim in state court relies upon the same theory as his "cause" argument, namely, Clawson's misconduct. Accordingly, we discuss these issues together.

It is well established that ineffective assistance of counsel during state post-conviction proceedings cannot serve as cause to excuse factual or procedural default. See Coleman v. Thompson, 501 U.S. 722, 752–55 (1991); Simpson v. Norris, 490 F.3d 1029, 1033 (8th Cir. 2007) ("[W]here there is no constitutional right to counsel there can be no deprivation of effective assistance."); see also 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). There is no right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution in collateral, post-conviction, state-court proceedings, and as such, the failures or infirmities of counsel at this stage generally are not attributable to the state. Coleman, 501 U.S. at 754 ("[W]here the State has no responsibility to ensure that the petitioner was represented by competent counsel . . . . it is the petitioner who must bear the burden of a failure to follow state procedural rules. In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.").

Wooten frames his cause argument in a manner intended to avoid this general rule. He argues that Clawson was not merely ineffective, but that there was a complete breakdown of the "agency" relationship that typically exists between attorneys and clients due to Clawson's Oklahoma disbarment, felonious record, and concealment of these facts from Wooten and the Arkansas courts. In fact, Wooten asserts that Clawson's fraud precluded the initial establishment of an attorney–client agency relationship. With no agency relationship, Wooten argues, Clawson's failures in Wooten's case are not attributable to Wooten; rather, Clawson's fraud and concealment serve as external impediments that prevented the presentation of facts and arguments in state court.

The gravity of Clawson's failures makes Wooten's argument compelling. The State does not seriously attempt to defend Clawson's deplorable conduct, and it is

readily apparent that Clawson was responsible for Wooten's procedural default. In fact, at some point, perhaps during the initial appeal from the denial of Rule 37 relief, it appears that Clawson ceased providing even ineffective assistance to Wooten and simply abandoned him altogether.

Nevertheless, we cannot accept Wooten's argument because, in our view, the Supreme Court rejected a similar "agency-breakdown" theory in Coleman, albeit on less compelling facts. See Coleman, 501 U.S. at 753–54. There, the habeas petitioner alleged that state post-conviction counsel erred so grievously that "the lawyer cease[d] to be an agent of the petitioner." Id. at 754. The Court addressed this contention, stating that, "it is not the gravity of the error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., 'imputed to the State.'" Id. (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). The Court in Coleman emphasized that where no right to counsel exists, an act or omission of counsel could not be considered an "objective factor external to the defense." Id. at 753 (quoting Carrier, 477 U.S. at 488). The Court identified "interference by officials" or the prior unavailability of legal or factual bases for relief as types of objective external factors that might serve as cause capable of excusing default. Id. The Court, however, rejected agency breakdown as a viable theory of cause.

Subsequently, we recognized the Supreme Court's firm rejection of counsel-based arguments regarding cause for default, stating that something "beyond the control of post-conviction counsel, like State interference," was required to show cause. Zeitvogel v. Delo, 84 F.3d 276, 279 (8th Cir. 1996). In Zeitvogel, the petitioner's state post-conviction counsel failed to present certain arguments and failed to obtain and present easily accessible records in support of those arguments. The petitioner attempted to characterize this failure as resting on the shoulders of the state because the state had not adequately responded to a discovery request that encompassed the records. We rejected the petitioner's arguments, finding that the

-18-

omission by the state could not serve as cause in the face of counsel's failure to take reasonable and simple steps to obtain the records by other means. Id. at 281 ("In our view, the blame for Zeitvogel's procedural default falls squarely on Zeitvogel's postconviction counsel rather than the State."). In Zeitvogel, then, even where the state failed to fully comply with an information request, we nevertheless held that default was attributable to post-conviction counsel whose actions could not serve as cause.

Here, by comparison, the state at most failed to discover that Clawson had been convicted of a felony and disbarred in Oklahoma. Although the Arkansas Supreme Court regulates attorneys in Arkansas, we do not believe the state court's failure to discover Clawson's past and remove him from practice in a more timely fashion may serve as an "external factor," Carrier, 477 U.S. at 485, or "State interference." Zeitvogel, 84 F.3d at 279. Rather, Clawson withheld information from the state courts, just as he withheld information from Wooten. Clawson's actions, then, and not external factors or the actions of the state, prevented Wooten from developing his claims. While we find Wooten's situation sympathetic and his argument compelling, we cannot accept his argument in light of Coleman and Zeitvogel.

Wooten cites Jamison v. Lockhart, 975 F.2d 1377, 1379–80 (8th Cir. 1992), for the proposition that we may excuse procedural default for cause when the attorney error responsible for the default is so egregious that the attorney ceases to be an agent of the petitioner. In Jamison, a petitioner had failed to raise an ineffective assistance claim in state court. The claim of ineffectiveness stemmed from an alleged conflict of interest on the part of trial counsel, and trial counsel's failure to file a direct appeal. In fact, the petitioner in Jamison had asked trial counsel to file a direct appeal, but trial counsel failed to do so. The petitioner eventually filed a flawed, pro se appeal, and the Arkansas Supreme Court accepted the filing and addressed the claims that the petitioner raised in his pro se appeal. The record did not show when the petitioner became aware of trial counsel's purported conflict of interest, and it was not clear

whether concealment of the conflict on the part of trial counsel had prevented the petitioner from raising a timely ineffective assistance claim in state court. Id. at 1380–81.[3]

In Jamison, we did not hold that a breakdown of an agency relationship between a petitioner and state post-conviction counsel satisfied the cause and prejudice standard. Rather, we noted that a conflict of interest on the part of trial counsel would be a structural error and that such a conflict could be cause for default. Ultimately, we remanded for an evidentiary hearing to explore the issue of trial counsel's conflict as cause for default. We noted the relatively undeveloped status of the record, and we also observed that the strict rules regarding the availability of federal evidentiary hearings on the merits of habeas cases do not preclude our court from ordering evidentiary hearings on the limited issues of cause or prejudice. Id. at 1380-81 ("We recognize the stress placed on state court resolution of factual issues in [Keeney v. Tamayo-Reyes, 504 U.S. 1 . . . (1992)], but we do not read Tamayo-Reyes as altering our discretionary power to order this hearing.").

We did not suggest in Jamison that ineffectiveness on the part of post-conviction counsel could serve as cause. Rather, the undeveloped allegations of cause

---

[3]We stated:

> The cause of the default could be certain actions or decisions of [trial counsel] flowing from his divided loyalties. The cause of these actions or decisions would thus be external, and perhaps directly contrary, to the defense of Jamison in this case. The cause would satisfy the standard enunciated in Murray because it arose from such an external source and not from the trial strategy or tactics of Wright acting in Jamison's defense. That conflicting loyalties may have influenced strategies and tactics does not defeat the conclusion that the conflict of interest was an objective factor external to the defense.

Jamison, 975 F.2d at 1380.

-20-

in <u>Jamison</u> related to a conflict of interest on the part of trial counsel. <u>Jamison</u>, then, is consistent with <u>Coleman</u> and <u>Zeitvogel</u> because ineffectiveness of trial counsel or counsel on direct appeal is attributable to the state and may be treated as an external impediment amounting to cause. <u>Coleman</u>, 501 U.S. at 754. At trial and on direct appeal the state has an obligation under the Sixth Amendment and Fourteenth Amendments to the U.S. Constitution to provide effective, conflict-free counsel. The failure to do so is a constitutional violation, and it is the existence of this constitutional violation, not the gravity of the error, that makes the error "external" to the petitioner and qualifies the error as cause for default. <u>Id.</u>

Finally, we note that it is understandable that Wooten seeks to rely on <u>Jamison</u>. In that case, while discussing <u>Coleman</u>, we stated, "The Court implied that cause would exist when the 'error' of the attorney was 'so bad that the lawyer ceases to be an agent of the petitioner.'" <u>Jamison</u>, 975 F.2d at 1380 (quoting <u>Coleman</u>, 501 U.S. at 754, further quotations omitted). In fact, however, <u>Coleman</u> did not state that a sufficiently egregious error by post-conviction counsel could serve as cause. Rather, the Court in <u>Coleman</u> presented this theory as the petitioner's argument, firmly rejected it, and held that only error amounting to a constitutional violation could serve as cause:

> Attorney error that constitutes ineffective assistance of counsel is cause, however. This is not because, as Coleman contends, the error is so bad that "the lawyer ceases to be an agent of the petitioner." In a case such as this, where the alleged attorney error is inadvertence in failing to file a timely notice, such a rule would be contrary to well-settled principles of agency law. Rather, as <u>Carrier</u> explains, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." *In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., "imputed to the State."*

Coleman, 501 U.S. at 753–54 (emphasis added) (internal citations omitted).  Because Jamison dealt with uncertainty regarding whether the actions of trial counsel had caused default, we cannot accept Wooten's attempt to characterize Jamison as creating an exception to Coleman, and we reject his cause and prejudice argument.

B.     Actual Innocence

The Supreme Court has addressed the question of what "actual innocence" means in the context of the penalty-phase of a capital trial.  See Sawyer v. Whitley, 505 U.S. 333, 341 (1992) ("The phrase 'innocent of death' is not a natural usage of those words, but we must strive to construct an analog to the simpler situation represented by the case of a noncapital defendant.").  In Sawyer, the Court held that actual innocence in the death penalty context did not extend to the nebulous and multi-factored question of how additional mitigation evidence might have impacted the jury.  Id. at 346–47.  Rather, "the 'actual innocence' requirement must focus only on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error."  Id. at 347.  Accordingly, in applying the actual-innocence exception in the death-penalty context, courts may not consider the jury's penalty-phase balancing function, and actual innocence refers only to the underlying finding of guilt and the jury's finding of death-qualifying aggravators.

Here, the district court viewed the record as a whole, including the evidence that Pennsylvania Counsel tendered to the federal court, and determined that it did not create a "reasonable probability" that a jury would have acquitted Wooten or found the death-qualifying aggravator inapplicable.  See Schlup, 513 U.S. at 327 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."); see also Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005) (discussing Schlup and the standards to be applied to claims of actual innocence).  We review the

-22-

district court's factual determination in this regard only for clear error. <u>Raymond v. Weber</u>, 552 F.3d 680, 683 (8th Cir. 2009) ("We review a district court's denial of habeas relief for clear error in respect to findings of fact, and de novo for questions of law or for mixed questions of law and fact."); <u>see</u> <u>Clemons v. Luebbers</u>, 381 F.3d 744, 754 n.7 (8th Cir. 2004) (identifying a district court's conclusion regarding the credibility of evidence of actual innocence as a factual determination to be reviewed for clear error).

The district court's assessment of Wooten's claim withstands this deferential level of scrutiny. To establish actual innocence, Wooten's new evidence of mental-health infirmities needed to show that he was incapable of formulating the necessary mens rea for the underlying offense or the "knowingly" element of the death-qualifying aggravator. The experts' opinions suggested this could be the case, but the district court did not view the experts' reports in isolation. Rather, it viewed the newly proffered evidence in light of the details of the offense, Wooten's accomplishments in life (including completing high school and attending college), and the absence of any prior criminal record. The court determined that Wooten failed to establish the requisite probability that reasonable jurors would have found these elements of the crime or the aggravator missing. This determination was not clearly erroneous as reasonable jurors could have viewed Wooten's accomplishments in life and the facts of the crime itself as being inconsistent with the mental-health experts' assessments.[4]

---

[4]Although the actual innocence exception cannot reach the highly subjective issue of the jury's balancing of aggravating and mitigating circumstances, the prejudice aspect of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and the prejudice aspect of the cause and prejudice analysis may reach this question. <u>See, e.g.</u>, <u>Paul v. United States</u>, 534 F.3d 832, 843 (8th Cir. 2008) (discussing additional mitigation evidence and the jury's balancing function in the context of the prejudice prong of an ineffective assistance of counsel claim), <u>petition for cert. filed</u>, No. 08-8871 (Feb. 20, 2009); <u>Parkus v. Delo</u>, 33 F.3d 933, 938–40 (8th Cir. 1994) (discussing the failure to introduce family history and mental health evidence and stating, "For the purposes

C.     Motion to Appear and Motion to Recall and Reopen

Relief is unavailable to Wooten, then, unless the Motion to Recall and Reopen is a proper vehicle for exhausting claims and presenting evidence in the Arkansas courts. Wooten argues that, through the Motion to Recall and Reopen, he seeks a regularly available means for further, state-court, collateral review such that we should deem his belated proffer to the state court to be a sufficient presentation of evidence and exhaustion of claims to open the door for federal review under 28 U.S.C. § 2254(b)(1)(A) and (e)(2)(B). He also argues that, to the extent the state court's denial of the Motion to Appear may have terminated his Motion to Recall and Reopen, the state court's action does not constitute an independent and adequate state law grounds precluding federal review.

A Motion to Recall and Reopen as permitted in Arkansas is an unusual motion that requires some discussion. Such a motion, if granted, allows further review of otherwise final cases where a petitioner shows that initial post-conviction proceedings broke down. See Collins v. State, 231 S.W.3d 717, 719–20 (Ark. 2006). The Arkansas Supreme Court, in Robbins v. State, 114 S.W.3d 217, 223 (Ark. 2003),

---

only of cause and prejudice, we believe this new evidence, while having some bearing on guilt, could have had a stronger impact and effect on the penalty phase. Further, we determine that a reasonable probability exists that the jury, if given the opportunity to consider Parkus' additional evidence, would not have convicted him of first degree murder at the guilt phase, or, otherwise, would not have imposed the death penalty at sentencing."). Because Wooten asserted the impact of additional mitigating evidence in the balancing stage as prejudice in relation to his cause and prejudice argument, it remained necessary for us to address the question of cause related to his claims of cause and prejudice and not simply rest our decision on the district court's assessment of actual innocence in light of the newly presented evidence. In addition, Wooten asserts impact at the balancing stage as a component of prejudice regarding his ineffective assistance claim as presented in his state court Motion to Recall and Reopen. Accordingly, we also find it necessary to discuss the impact of Wooten's belated state-court filings and evidentiary proffers.

determined that it had the inherent authority and jurisdiction to recall its own mandate in a death-penalty case where a defendant alleged an error that was identical to an error in another capital case for which the same court had recently granted relief. In rejecting the state's argument that the court was without authority to recall its own mandate, the court stated, "The undeniable fact is this court will recall a mandate and reopen a case in extraordinary circumstances." Id. at 222. The court then emphasized its view that relief of this kind was to be exceedingly rare: "These circumstances combine to make this case *sui generis*. Indeed, we consider this case to be one of a kind, not to be repeated." Id. at 223. The circumstances the court referred to included the facts that a federal court had dismissed a related habeas case based on a failure to exhaust state remedies, the Arkansas Supreme Court had recently decided a case that was "on all fours legally with the issue presented" in Robbins, and the case was a capital case that the Arkansas Supreme Court viewed as qualitatively different and worthy of more thorough review. Id. at 222–23.

Subsequently, the Arkansas Supreme Court has recalled mandates and reopened capital cases in two other cases. Lee v. State, 238 S.W.3d 52, 58 (Ark. 2006); Collins, 231 S.W.3d at 720. In Lee, the court discussed the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132 (1996), and stated, "By this act, Congress chose to restrict federal *habeas corpus* review in exchange for the states' appointing competent counsel for indigent capital defendants for purposes of state postconviction review." Lee, 238 S.W.3d at 56. The court then discussed state procedural rules that Arkansas had put in place to ensure adequate post-conviction representation and review and "*to eliminate the need for multiple federal habeas corpus proceedings in death cases.*" Id. (quotation omitted). The court in Lee identified the circumstances as set forth in Robbins, found them satisfied on the facts of Lee, and recalled its mandate. Id. at 54–55. In Lee the actual infirmity or breakdown in state post-conviction proceedings was due to the fact that post-conviction counsel was impaired by alcohol at the time of representation. Id. at 54.

In <u>Collins</u>, as in the present case, Arkansas post-conviction petitions were not verified, as required by Arkansas Rule of Criminal Procedure 37.5. <u>Collins</u>, 231 S.W.3d at 718. The court in <u>Collins</u> found the record confusing as it included unverified filings spanning several years including filings from different attorneys as well as pro se filings. <u>Id.</u> at 718–19. Eventually, the state motion court held a hearing and denied relief, but a complete record of the hearing eluded the Arkansas Supreme Court. <u>Id.</u> at 719. Ultimately, in an act clearly intended to permit the petitioner to begin his post-conviction proceedings anew, the Arkansas Supreme Court concluded:

> Clearly, in this death case we have a breakdown in the postconviction relief proceedings. We therefore remand this case to the circuit court for the appointment of a Rule 37.5 qualified attorney and for Collins to file a verified petition for postconviction relief that complies with Rule 37.5. Collins may raise any and all issues he wishes to raise in the new petition.

<u>Id.</u> at 720.

Recalling the mandate and reopening a case, then, is not a completely unique act, as suggested in <u>Robbins</u>, but it appears to remain extraordinary rather than routine. This procedural mechanism is of great potential benefit to prisoners who have compelling evidence and arguments to show that they were denied fair trials but who lost their opportunities to prove unfairness due to the incompetency of their post-conviction counsel. This procedural mechanism is, in a sense, an act of grace by the state that is not constitutionally mandated (because, as we have repeatedly held and as we discussed above, the U.S. Constitution provides no right to effective assistance of post-conviction counsel). The motion to recall comes after the appeals from direct and collateral proceedings when the state already considers the case final, and, apparently, there is no time limit imposed in the Arkansas cases discussing the procedure. <u>See, e.g.</u>, <u>Collins</u>, 231 S.W.3d at 718 ("More than six years have passed since the mandate issued . . . .").

-26-

We welcome and applaud this mechanism given our frequent inability to provide relief in the face of questionable representation by post-conviction counsel. As such, we have a disincentive to use the state's act of grace as a means to reach a case that would otherwise be unreviewable under the restrictions of 28 U.S.C. § 2254. Doing so would, in effect, penalize the state for creating an additional procedural protection by opening the door to a further round of federal review that would not have been available absent the additional procedure. General concerns of federalism and comity, therefore, militate against our using such a procedure to reach otherwise unreviewable cases. These concerns also push us towards the conclusion that we must deem the state record complete without reference to claims and evidence a petitioner first presents to the state court after the end of other proceedings and in the pursuit of this extraordinary form of relief.

Further, our court's and the Supreme Court's treatment of due process claims related to state-provided post-conviction counsel further demonstrate that the state grants of additional layers of protection does not open the door to an additional layer of federal review. See Pennsylvania v. Finley, 481 U.S. 551, 555–57 (1987); Simpson v. Norris, 490 F.3d 1029, 1033–34 (8th Cir. 2007). In Simpson, we rejected a due process claim based on a state's purported denial of post-conviction counsel after the state imposed upon itself an extra-constitutional duty to provide such counsel. Simpson, 490 F.3d at 1033–34. We relied upon Finley in rejecting the claim and stated, "The Supreme Court has thus left little doubt as to its view that a state's decision to grant a right to counsel in post-conviction proceedings does not give rise to a due process claim if counsel performs deficiently." Id. at 1034. We quoted from Finley, stating:

> The Court rejected the contention that a "right to counsel" created by a state gives rise to a constitutional guarantee: "It is the source of the right to a lawyer's assistance, combined with the nature of the proceeding, that controls the constitutional question. In this case, respondent's access to a lawyer is the result of the State's decision, not the command of the

United States Constitution." [Finley, 481 U.S. at 555–56.] The Court further explained that "the State has made a valid choice to give prisoners the assistance of counsel in post-conviction proceedings without requiring the full panoply of procedural protections that the Constitution requires be given to defendants who are in a fundamentally different position—at trial and on first appeal as of right." Id. at 559.

Simpson, 490 F.3d at 1033–34 (alterations omitted).

We view the additional remedy Arkansas provides by permitting motions to recall and reopen as being akin to the protective, but constitutionally unrequired, provision of state post-conviction counsel. Just as the Supreme Court and our court rejected due process claims in Finley and Simpson, we must reject Wooten's request to have the federal courts oversee the Arkansas court's application of its state-created, additional means for review.

This appears to be a case that could satisfy the three factor test in Lee, 238 S.W.3d at 54–55, for recall of the mandate. However, that is an issue for the Arkansas Supreme Court to decide. Simply put, this is a case for which the federal courts can provide no relief because of post-conviction counsel's failure to exhaust the allegedly meritorious claims.

In support of his arguments, Wooten relies upon cases from our court treating motions to recall the mandate under Missouri law as permissible avenues for exhausting state claims. Such motions in Arkansas, however, differ from the similarly named motions in Missouri. We have addressed the Missouri motions on several occasions, and in Missouri, such motions were the proper and ordinary method for asserting claims of ineffective assistance on the part of direct-appeal counsel.[5] See,

---

[5]For sentences issued prior to January 1, 1996, Missouri required convicted defendants to pursue state post-conviction relief in the trial court prior to resolution of their direct criminal appeals. See Mo. R. Crim. Pro. § 29.15(l) (1995) ("If an

e.g., <u>Williams v. Kemna</u>, 311 F.3d 895, 897 (8th Cir. 2002) ("For petitioners . . . sentenced prior to January 1, 1996, this was the proper way to raise a claim of ineffective assistance of appellate counsel under Missouri law."); <u>Chambers v. Bowersox</u>, 157 F.3d 560, 565–66 & n.5 (8th Cir. 1998). Even in Missouri, though, such motions were not appropriate vehicles for exhausting other types of claims. <u>See</u> <u>Bell-Bey v. Roper</u>, 499 F.3d 752, 756 (8th Cir. 2007) (holding that a Missouri motion to recall the mandate was not an appropriate means of exhausting a different type of claim).

Finally, we note that our decision today does not foreclose relief in cases where a meritorious claim of actual innocence exists or cause and prejudice is shown. We

---

appeal is filed from the judgment sustaining or overruling a motion filed under the provisions of this Rule 29.15, the appeal from the judgment of conviction shall be consolidated with the appeal from the judgment on the motion."); <u>State v. Griddine</u>, 75 S.W.3d 741, 743 n.2 (Mo. Ct. App. 2002) (discussing amendments to Rule 29.15 effective January 1, 1996 and changes to Missouri's "consolidated post-conviction/direct appeal procedure."). In Missouri, then, the first appeal in a criminal case typically was a combined appeal that included the direct appeal and an appeal from any denial of post-conviction relief. Accordingly, if constitutionally mandated counsel was ineffective in this initial appeal, a Missouri petitioner had no opportunity to raise a claim of ineffectiveness of appellate counsel until after Missouri's appellate courts already had ruled on the appeal from the denial of post-conviction relief. As such, a Missouri petitioner could file a motion to recall the mandate to properly present a claim alleging ineffectiveness of appellate counsel. We have recognized this fact, stating that Missouri petitioners must pursue this avenue of relief in order to properly exhaust certain claims. <u>See, e.g.</u>, <u>Simpson v. Camper</u>, 927 F.2d 392, 394 (8th Cir. 1991) (holding case in abeyance to permit Missouri petitioner to file a motion to recall the mandate to assert a claim of ineffective assistance of direct-appeal counsel). <u>But see</u> <u>Bell-Bey v. Roper</u>, 499 F.3d 752, 756 (8th Cir. 2007) (holding that a Missouri motion to recall the mandate is not an appropriate means of exhausting other types of claims that are unrelated to the alleged ineffectiveness of appellate counsel); <u>Nave v. Delo</u>, 62 F.3d 1024, 1031–32 & n.6 (8th Cir. 1995) (discussing claims permissible in Missouri motions to recall mandates).

also do not suggest that today's opinion precludes relief where an extraordinary remedy becomes ordinary through frequency of use or application.

Because Wooten's Motion to Recall and Reopen is not a proper vehicle for exhausting state remedies in Arkansas or creating a state record that might support federal habeas claims, it was proper for the district court to reject his Rule 59(e) motion and his motion to stay federal proceedings. Also, because the state's denial of the Motion to Appear and apparent refusal to address the Motion to Recall and Reopen afford no basis for federal relief, we need not reach the question of whether disposition of the Motion to Appear qualifies as an adequate and independent state grounds for denying further relief.

We affirm the judgment of the district court.

BRIGHT, Circuit Judge, concurring.

Although the relevant statutory and judicial authorities compel me to concur in the court's opinion, I nonetheless write separately to further explain my views.

This is a sad case. Sad first and foremost for the victims of a heinous crime. But also because this case vividly shows that, for those convicted of capital offenses, the quality of counsel may well be the difference between life imprisonment without parole and the death penalty.

Here, in brief, is the picture painted by Wooten (a not unreasonable view of the record): He received poor representation at trial, particularly at the penalty phase, when his first counsel's entire penalty-phase presentation filled less than ten transcribed pages. That attorney, David Gibbons, called only two witnesses: an officer from the jail where Wooten was kept during trial and one of Wooten's former co-workers. Gibbons also told the jury that it would "have to" find one aggravator

and that he did not intend to appeal to emotion. As the court acknowledges, Gibbons "presented no evidence of personal history or testimony from family members to humanize Wooten." *Ante*, at 4. That inadequate representation continued on direct appeal through the Arkansas courts, which denied relief.

Then, the hiring of James O. Clawson, a disbarred felon, to represent Wooten in post-conviction proceedings, as we have known, was a great mistake. The mistake was not the fault of Wooten or his family. Clawson, among other things, failed to disclose his multiple felony convictions or his disbarment in Oklahoma to either Wooten or the courts. When Clawson filed the post-conviction petition (a scant ten pages), he failed to inform Wooten or seek Wooten's personal verification of the pleadings, which is required under Arkansas law. The post-conviction pleadings raise the question whether Clawson did any independent investigation of the case whatsoever.

Unsurprisingly, Clawson's post-conviction representation failed miserably in the district court. Next, Clawson missed a deadline to appeal the district court's denial of the post-conviction petition, an error remedied only by the grace of the Arkansas Supreme Court. But it did not really matter, as the untimely appeal contained only five pages of argument. The Arkansas Supreme Court, identifying an issue sua sponte, remanded the case to the district court with instructions to hold a hearing or enter written findings. Clawson took no further action. When the district court made findings without an evidentiary hearing, Clawson failed to appeal and, in clear prejudice to Wooten, did not even tell him that no appeal was filed.[6] Ultimately, after granting Wooten permission to appeal, the Arkansas courts denied his request for post-conviction relief.

_____

[6]Clawson's trouble with the law continued through this entire period, including a reprimand from the Arkansas Supreme Court in an unrelated case, two additional convictions for drunken driving, a conviction in federal court on six counts of bankruptcy fraud, and finally his disbarment in Arkansas.

This relation of the court procedures represents a breakdown in the criminal-justice system of great magnitude. It seems to be obvious, even to any observer, that the criminal-justice system failed in this case, both during the penalty phase and the post-conviction proceedings. I express no opinion on the constitutional sufficiency of Wooten's representation, but as a matter of common sense and judicial experience, the quality of Wooten's representation is as shocking as it is poor.

Nonetheless, this court may be limited in its ability to correct an injustice. Under existing statutory and case law, Wooten may have procedurally defaulted his habeas claims because he did not present them in the state courts, and he is unable to avail himself of the narrow exceptions to the general rule. Specifically, Wooten's incompetent post-conviction counsel, although dooming an important avenue for relief in state court, maybe is insufficient to excuse the procedural default that that very representation created. *See Coleman v. Thompson*, 501 U.S. 722, 752-55 (1991) (noting that ineffective assistance of post-conviction counsel cannot serve as cause to excuse procedural default). Federalism, comity, and the finality of judgments are important, to be sure. But the current legal landscape, as observed in the opinion of the majority, does not permit the intervention of the federal courts at this time.

Be that as it may, Wooten's clearest avenue for relief relies in the Arkansas Supreme Court in the form of his apparently still pending Motion to Recall Mandate. As the court observes today, "[t]his appears to be a case that could satisfy the three factor test in *Lee* [*v. State*, 238 S.W.3d 52, 55 (Ark. 2006)]." *Ante*, at 28. I agree completely.

_____